UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
UNITED STATES OF AMERICA,        )
                                 )
           Plaintiff,            )
                                 )
      v.                         )    CIVIL ACTION
                                 )    NO. 09-11623-WGY
THE COMMONWEALTH OF MASSACHUSETTS )
and MASSACHUSETTS DEPARTMENT OF   )
CORRECTIONS,¹                    )
                                 )
           Defendants.           )
                                 )
_____
```

MEMORANDUM OF DECISION

YOUNG, D.J.                                            May 4, 2011

      "[N]othing so concentrates the trial lawyer's mind as the

prospect of a trial on the morrow." Brookridge Funding Corp. v.

---

      ¹ This is the caption the parties have used throughout and
the Court uses it here.  It is however, something of a misnomer.
The Massachusetts Department of Corrections is an instrumentality
of the Commonwealth. Fully funded by the Commonwealth, it is not
capable either of suing or being sued.  This is, therefore, a
suit directly against the state.  At first blush, such a suit
would appear to violate the Eleventh Amendment.  Here it does not
because the Eleventh Amendment does not bar federal court suits
by the United States government against a state. See West
Virginia v. United States, 479 U.S. 305, 311 (1987) ("States have
no sovereign immunity as against the Federal Government.");
United States v. Mississippi, 380 U.S. 128, 140-41 (1965) ("The
Eleventh Amendment in terms forbids suits against States only
when 'commenced or prosecuted . . . by Citizens of another State,
or by Citizens or Subjects of any Foreign State.'  While this has
been read to bar a suit by a State's own citizen as well, nothing
in this or any other provision of the Constitution prevents or
has ever been seriously supposed to prevent a State's being sued
by the United States.").

Aquamarine, Inc., 675 F. Supp. 2d 227, 230 (D. Mass. 2009) (with apologies to Samuel Johnson). This is big, sprawling, complex litigation. Unduly contentious, it generated 110 docket entries (including a motion for sanctions and numerous motions to delay the progress of the case toward trial) prior to the final pre-trial conference. Yet, with a genuine trial in the offing, it has shriveled to a single issue. As to what well could be the most important issue in this case, the United States, dissatisfied with the way things were going, eager for an appeal, and apparently unable to prove this aspect of its case, simply gave up.[2]

## I.  THE LEGAL FRAMEWORK

"Federal law has long prohibited not just intentional discrimination by employers, but also practices that have an **unintentional**[3] disparate impact on minorities." Joseph A. Seiner

---

[2] As detailed below, every case management decision in this case was made with an eye toward moving the case to trial. Because this is a disfavored approach which implicates much larger issues, a brief Addendum is attached to this opinion to explain the present tension within the district court judiciary.

[3] The fact that the law may impose liability upon private parties for unintentional conduct creates a tension with the Equal Protection Clause of the Fourteenth Amendment. See Jennifer C. Braceras, Killing the Messenger: The Misuse of Disparate Impact Theory To Challenge High-Stakes Educational Tests, 55 Vand. L. Rev. 1111, 1141 (2002); Eang L. Ngov, War and Peace Between Title VII's Disparate Impact Provision and the Equal Protection Clause: Battling for a Compelling Interest, 42 Loy. U. Chi. L.J. 1, 7 (2010); Michael Selmi, Was the Disparate Impact Theory a Mistake?, 53 UCLA L. Rev. 701, 702 (2006). Two commentators have indicated that the majority opinion in Ricci v.

2

& Benjamin N. Gutman, <u>Does Ricci Herald a New Disparate Impact?</u>, 90 B.U. L. Rev. 2181, 2181 (2010) (emphasis added). This is such a disparate impact case. It is expressly governed by Section 703 (k)(1) of Title VII. 42 U.S.C. § 2000e-2(k)(1). It requires the court[4] to consider (in the following order) three separate issues, or "prongs."

> First, the plaintiff must establish that an identified employment practice results in a disparate impact on a protected group [prong one]. Second, the employer must prove that the employment practice is "job related for the position in question and consistent with business necessity [prong two]." Finally, even if the employer satisfies its burden on the job-relatedness question, the plaintiff can still prevail by establishing that there is an alternative employment practice available with less discriminatory impact that still satisfies the employer's

---

<u>DeStefano</u>, 129 S. Ct. 2658 (2009), suggests that there may now be an affirmative defense for employers who either did not know about the disparate impact or did not intend to subject employees to an unlawful practice. Joseph A. Seiner & Benjamin N. Gutman, <u>Does Ricci Herald a New Disparate Impact?</u>, 90 B.U. L. Rev. 2181, 2181 (2010). Here, the Commonwealth of Massachusetts neither raises an Equal Protection challenge nor poses the affirmative defense suggested by Seiner and Gutman.

[4] No jury is available in a Title VII disparate impact case. S. Rep. No. 101-315, at 50 (1990); <u>see</u> Suja A. Thomas, <u>A Limitation on Congress: "In Suits at Common Law</u>," 71 Ohio St. L.J. 1071, 1079 (2010). <u>But cf.</u> <u>Tull</u> v. <u>United States</u>, 481 U.S. 412 (1987). Here, neither party claimed a jury as matter of constitutional right, though the Commonwealth asked for an advisory jury, ECF No. 80, and the United States demurred on efficiency grounds, ECF No. 92. As an empirical matter, the United States is wrong. Jury trials are actually **more** efficient than non-jury proceedings. <u>See</u> Theodore Eisenberg & Kevin M. Clermont, <u>Trial by Jury or Judge: Which is Speedier?</u>, 79 Judicature 176, 178 (Jan.-Feb. 1996) (examining federal civil cases and finding that although trials themselves may proceed more quickly before a judge, jury-waived cases last longer on the docket.)

business needs [prong three].[5]

Seiner & Gutman, <u>supra</u>, at 2191 (footnotes omitted); <u>see also</u> 42 U.S.C. § 2000e-2(k)(1)(A).

In sum, if the respondent wins the first prong, it's game over. If, however, the claimant succeeds on the first prong, then the winner of two out of three prevails.

## II. PRIOR PROCEEDINGS

The plaintiff, the United States of America ("United States"), commenced this action on September 28, 2009, against the Commonwealth of Massachusetts and the Massachusetts Department of Corrections (collectively the "Commonwealth") seeking an order enjoining the Commonwealth from administering the Caritas Physical Abilities Test ("PAT") in the selection of entry-level correctional officers ("COs") and correctional program officers ("CPOs") due to its alleged disparate impact on women in violation of Title VII, 42 U.S.C. § 2000e-2. The United States also seeks back pay with interest,[6] offers of employment,

---

[5] Disparate impact cases thus shift the burden of persuasion to the respondent on the second prong if the claimant establishes the first prong. <u>Griggs</u> v. <u>Duke Power Co.</u>, 401 U.S. 424, 432 (1971). This is sharply different from the protocol articulated in <u>McDonnell Douglas Corp.</u> v. <u>Green</u>, 411 U.S. 792, 802 (1973), which shifts only the burden of production to the defendant upon proof of the plaintiff's prima facie case. This difference is especially significant in light of the summary judgment analysis below.

[6] Compensatory damages, however, are not available to a claimant in a disparate impact case. <u>See</u> 42 U.S.C. § 1981a(a)(1).

retroactive seniority, and other benefits for women who were affected by the use of the PAT. Compl., ECF No. 1. The Commonwealth denied these allegations and issue was joined on December 4, 2009. Answer, ECF No. 9. Under our Local Rules, an initial case management scheduling conference is to be held within 90 days of the first defense pleading. D. Mass. L.R. 16.1(a). The parties duly submitted a proposed case management order that posited a rather leisurely run-up to trial. ECF No. 11. The Court returned the proposal for re-drafting, indicating that it expected the case to be trial-ready not later than 12 months after the initial case management  scheduling conference.[7]

At the February 10, 2010, initial case management scheduling conference the Court placed the case on its running trial list[8] for February 7, 2011, with a final pre-trial conference to take place no sooner than January 3, 2011.

Discovery proved unnecessarily contentious, reflecting credit on neither party. The United States, claiming that the case was evolving, tried to renege on its agreements in the case

---

[7] This is the Court's usual practice. The U.S. District Court Speaks 27 (6th ed. 2011). It has been my experience that a year to get ready for trial is, in almost every instance, more than enough time if the parties seriously want a trial. Here ten lawyers filed appearances for the United States and six for the Commonwealth. There was no occasion for excessive delay.

[8] This Court's use of a "running" trial list is analyzed fully in William G. Young, Vanishing Trials, Vanishing Juries, Vanishing Constitution, 40 Suffolk U. L. Rev. 67, 80 (2006).

management scheduling order concerning the scope and extent of discovery. The Court refused to make changes. The Court's order of August 23, 2010 is illustrative:

> The plaintiff may have 10 seven hour depositions as it agreed unequivocally. Had it sought a different case management scheduling order, it was its duty to negotiate it at the time of the 16.1 conference. Moreover, the plaintiff's definition of "relating to" is vastly overbroad and is sticken [sic] without prejudice to framing a narrower, more focused definition.

Order, Aug. 23, 2010.

As the clock counted down toward trial, the parties began to scramble, seeking extensions of the deadlines set in the initial case management scheduling order. The Court allowed some of these, eventually extending discovery to January 3, 2011 and the dispositive motion deadline to January 21, 2011.[9] The trial date was, of course, not extended. <u>See</u> Order, Oct. 26, 2010.

Not surprisingly, on December 23, 2010, the United States moved for summary judgment on all three prongs.[10] Pl.'s Mot.

---

[9] I made several missteps in my scheduling orders. First, by adopting the parties' proposed schedule, I bifurcated liability and remedy, thus potentially fostering a far more lengthy process than usual. Second, by agreeing with the parties to crowd the dispositive motion deadline up against the trial date, I caused them needless expense. My usual practice is to set the dispositive motion filing deadline at least three months before the trial date. In retrospect, I should have stuck to that practice here.

[10] Today, a motion for summary judgment appears to be de rigeur in every civil case, imposing enormous costs on the judicial system. Why? Because it works (and lawyers know it).
  [As] Judge Patricia Wald wisely observed, the
  jurisprudence of the federal courts is the jurisprudence

of summary judgment. Patricia M. Wald, <u>Summary Judgement at Sixty</u>, 76 Tex. L. Rev. 1897 (1998). Today, commentators are in near unanimous agreement that federal courts overuse summary judgment as a case management tool, Arthur R. Miller, <u>The Pre-Trial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Cliches Eroding Our Day in Court and Jury Trial Commitments?</u>, 78 N.Y.U. L. Rev. 982, 1047 (2003); Stephen B. Burbank, <u>Vanishing Trials and Summary Judgment in Federal Civil Cases: Drifting Toward Bethlehem or Gomorrah?</u>, 1 J. Empirical Legal Stud. 591, 592, 600 (2004); Suja A. Thomas, <u>Why Summary Judgment is Unconstitutional</u>, 93 Va. L. Rev. 139 (2007); D. Theodore Rave, Note, <u>Questioning the Efficiency of Summary Judgment</u>, 8 N.Y.U. L. Rev. 875, 900 (2006); John Bronsteen, <u>Against Summary Judgment</u>, 75 Geo. Wash. L. Rev. 522, 551 (2007); and the courts themselves acknowledge the force of the charge. <u>See Doe</u> v. <u>Abington Friends School</u>, 480 F.3d 252, 258 (3d Cir. 2007) (Ambro, J.) ("Since the Supreme Court removed the [summary] judgment procedure from disfavored status in the 1980's, some have opined that the pendulum has swung too far in the opposite direction").

<u>In re One Star Class Sloop Sailboat built in 1930 with Hull No. 721, Named "Flash II"</u>, 517 F. Supp. 2d 546, 555 (D. Mass. 2007); <u>see</u> Ned Snow, <u>Judges Playing Jury: Constitutional Conflicts in Deciding Fair Use on Summary Judgment</u>, 44 U.C. Davis L. Rev. 483 (2010).

Employment discrimination cases are especially vulnerable to pseudo-analysis.

Simplistic, heuristic devices and formulaic approaches have led to an extraordinary rate of defendant decisions on summary judgment. In part, I suggest, this is the pressure of the docket. Discrimination claims have tripled over the last twenty years. And since they are so fact-bound, they take up multiple trial days. Clearly, some judges simply want to be rid of them. When I was a "baby judge" I attended a training session. The trainer was to address employment discrimination cases. He began his presentation with: "Here's how you can get rid of these cases . . ." and he was not talking about plaintiff's verdicts. Gender Bias Task Forces from the Ninth and Eight Circuits reported that judges were impatient with sex-based employment discrimination claims. . . . Summary judgment has transformed employment discrimination law, not just because it necessarily

Summ. J., ECF No. 73.  The Court set the motion hearing for
January 19 and the final pre-trial conference for January 27,
2011.  The Commonwealth's riposte on January 13, 2011, was
rapier-like, opposing the United States' motion and cross-moving
for partial summary judgment only on the first prong – the game
winner.  Defs.' Mem. L. Opp'n Pl.'s Mot. Summ. J. and Cross-Mot.
Partial Summ. J., ECF No. 84 ("Defs.' Mem.").  At the Court's
direction, the courtroom deputy clerk explored with the parties
whether they wished to treat the cross-motions as a case
stated.[11]  Both parties demurred, and the United States

---

eliminates jury trials but because it has transformed the
substantive law of discrimination.  Let me underscore
that – under the guise of summary judgment, judges, not
juries, are completely reshaping discrimination law –
what kinds of sexual comments are harassing, what kinds
of racist epithets count as discriminatory, what
environments disadvantage even the most reasonable of
women, what kinds of words connote discrimination.

Judge Nancy Gertner, Address to the Employment Law Conference,
Massachusetts Bar Assoc. (May 7, 2007); see also Suja A. Thomas,
Oddball Iqbal and Twombly and Employment Discrimination, 2011 U.
Ill. L. Rev. 215 (arguing that the new pleading requirements will
work a revolution akin to that of summary judgment when moving to
dismiss employment discrimination cases).

[11] Derived from the procedures of the courts of the
Commonwealth of Massachusetts, see, e.g., Parker v. Morrell, 59
Mass. App. Dec. 34 (Mass. Dist. Ct. 1976), the "case stated"
procedure is firmly established in the jurisprudence of the First
Circuit.  See, e.g., Continental Grain Co. v. Puerto Rico
Maritime Shipping Auth., 972 F.2d 426, 429 n.7 (1st Cir. 1992);
Boston Five Cents Sav. Bank v. Secretary of Dep't of Hous. &
Urban Dev., 768 F.2d 5, 11–12 (1st Cir. 1985); Bunch v. W.R.
Grace & Co., 532 F. Supp. 2d 283, 286–87 (D. Mass. 2008).  It is
a most helpful procedural device.  In this session of the Court,
it works like this: whenever cross-motions for summary judgment
reveal that the relevant facts appear without significant

immediately filed an emergency motion for a continuance. ECF No. 89. The Court had had enough. "Neither the Motion hearing, Final Pre-Trial Conference, nor the Trial will be continued in this case." Order, Jan. 14 2011.

On January 19, 2011, the Court held a hearing on the various motions for summary judgment. The Court, as is now its practice, put counsel on notice that a party that moves for summary judgment may have summary judgment taken against it.[12] Again,

---

dispute, the courtroom deputy clerk offers the parties to treat the case as a case stated. Should they accept, as was eventually the case here, the Court treats the undisputed facts as the established record and draws the reasonable inferences therefrom without the necessity of drawing adverse inferences against each moving party, cf. Fed. R. Civ. P. 56. The facts of the case being established, the Court affords each party thirty minutes for final argument (not the usual ten minutes per party when hearing argument on a motion). In due course, the Court enters findings and rulings as required by Federal Rule of Civil Procedure 52(a).

[12] This Court has previously explained:
The law in this circuit is well established: a party that moves for summary judgment runs the risk that if it makes a woefully inadequate showing, not only might its own motion for summary judgment be denied, the court may sua sponte order summary judgment against the movant. See Berkovitz v. Home Box Office, Inc., 89 F.3d 24, 29-30 (1st Cir. 1996); see also Sanchez v. Triple-S Mgmt. Corp., 492 F.3d 1, 7-9 (1st Cir. 2007). Before considering granting sua sponte summary judgment, however, certain conditions must be met. Specifically, to "ensure the targeted party has an adequate opportunity to dodge the bullet," a court may only enter summary judgment sua sponte if: (1) fact discovery is sufficiently advanced that the parties enjoyed a reasonable opportunity to glean the material facts, and (2) the targeted party has appropriate notice and a chance to present its evidence on the essential elements of the claim. Burkovitz, 89 F.3d at 29.

the Court offered case stated treatment. When this was declined, the Court heard a rather disjointed presentation where counsel jumped from prong to prong (10 minutes per side). Taking the matters under advisement, "the Court remind[ed] counsel of the imminent final pretrial conference and the trial." Court notes, Jan. 19, 2011. Over the ensuing week, I had about made up my mind to grant summary judgment for the Commonwealth on the second prong, but to deny the remainder of the cross motions.

"Due to the snowstorm and the inability of U.S. counsel to get here from Washington D.C., the [pre-trial] conference [was] reset for Friday, [January 28, 2011]." Court notes, January 27, 2011.

On Friday morning, January 28, 2011, the parties filed their Joint Pretrial Memorandum and the Court learned for the first time that they estimated a trial lasting over two months on liability alone.[13] ECF No. 108. The pretrial conference

---

Ambit Corp. v. Delta Airlines, Inc., 707 F. Supp. 2d 74, 78 (D. Mass. 2010). Both the necessary preconditions were met here. Since December 1, 2010, Rule 56 expressly provides that the court may "grant summary judgment for a nonmovant." Fed. R. Civ. P. 56(f)(1). As the Advisory Committee Note to the most recent amendment explains, "Subdivision (f) brings into Rule 56 text a number of related procedures that have grown up in practice."

[13] This Court's practice is to bi- or trifurcate civil jury trials estimated to last more than 20 trial days, reasoning that a month is a long enough commitment for citizen jurors. This, of course, is a jury-waived case. A two month trial would necessarily involve a stop and go process as the Court fits in pending criminal trials. Cf note 4, supra (discussing the relative efficiency of jury and jury-waived trials).

convened at 2:00 p.m.  The Court inquired as to the possibilities of settlement and encouraged the parties to talk.  No one was interested.  The Court then acted on the pending motions for summary judgment, denying the motions as to the first and third prongs but granting summary judgment **against** the United States on the second prong.

Counsel for the United States was thunderstruck.  First, they reminded the Court that the Commonwealth had not even moved for summary judgment on the second prong.  This was a non-starter.  The parties had been duly warned.  <u>See</u> note 12, <u>supra</u>.  Second, evidently playing for time, they wisely asked for a written exposition of the Court's reasoning.  They were assured one would be forthcoming **after** trial on the remaining issues.  Serious discussion then ensued.  The United States came to favor case stated treatment of the first prong - especially after the Court indicated that on the summary judgment record it appeared to be the likely winner on that prong.  On the assumption that the United States would, upon case stated hearing, prevail on the first prong, the parties agreed to a sensible nine day trial[14] on the third prong.  Trial was a week away.

---

[14] Like many other judges, and as recommended by the American Bar Association**,** ABA Principles for Juries and Jury Trials, Principle 12(A)**,** this Court (with the agreement of the parties at the final pretrial conference), establishes (and adheres to) reasonable time limits for every civil trial.  <u>See</u> D. Mass. L.R. 43.1(a); <u>The U.S. District Court Speaks</u>, <u>supra</u>, at 172-75.

On Friday, February 4, 2011, the Court held an hour long[15] hearing where the parties made final arguments upon the agreed record as to the first prong.  The Commonwealth put up a spirited defense and the Court felt unable to make findings and rulings from the bench.  Assuming the United States would win, however, the Court reminded the parties that trial on the third prong would commence at 9:00 a.m. on Monday, February 7, 2011.

At this juncture, the United States surprised everyone (at least they certainly surprised me) by announcing they were not going forward on the third prong.  The hearing thus adjourned, the Court taking the first prong under advisement.  Later in the day the United States filed a notice of withdrawal (without prejudice) of theory of liability (i.e. the third prong).  ECF No. 121.  The Commonwealth responded nearly instantly, claiming it had been betrayed.  ECF No. 122.  The Court responded, "The Court has been blindsided.  This is nothing more than an attempt to seek an interlocutory appeal and (perhaps) judgeshop.  Any withdrawal will be with prejudice.  Otherwise, be here Monday ready for trial."  Court notes, Feb. 4, 2011.  The United States then filed a notice of withdrawal (with prejudice) of theory of liability.  ECF No. 123.

_____

[15] The Court generally affords parties to a civil case one half hour per side for closing argument.  The U.S. District Court Speaks, supra, at 221.

On Monday, February 7, 2011, the Court empaneled the next case on the running trial list, <u>Brownell Trailers, LLC</u> v. <u>Kavanaugh-Brownell Boat Stands, LLC</u>, No. 10-cv-11234-WGY. It involved the federal anticybersquatting statute. The jury found for the defendant.[16]

## III. ANALYSIS

### A. The First Prong - Findings & Rulings

Because case stated treatment is the equivalent of actual trial upon a stipulated record, the Court necessarily must enter findings and rulings pursuant to Federal Rules of Civil Procedure 52(a)(1).

#### 1. Findings of Fact

Since June 2007, the Commonwealth has used the Caritas PAT to pre-screen and select applicants for CO and CPO positions. Pl.'s Statement Undisputed Material Facts ("Pl. Facts") ¶ 7, ECF No. 75. While there are several criteria that an applicant must meet, all must pass the PAT to be offered a position as a CO or

---

[16] The wisdom of Judge John H. Meagher's famous aphorism ("This is a trial court. Trial judges ought go on the bench every day and try cases.") is here starkly illustrated. District judges have a myriad of duties. It is necessary to have one organizing principle for the discharge of the judicial office. Judge Meagher's approach is the best advice I've ever received. Equally good is the advice given me by Judge Owen Panner of the United States District Court for the District of Oregon: "There's not too much to this judging business, Bill. You find out what cases you have. You get them to trial as soon as you reasonably can. You try cases the best you know how. You decide what you need to decide as fairly as you can - and you keep moving on."

CPO.  <u>Id</u>. ¶ 12.  The PAT is made up of 11 events that applicants

must complete either within a given time frame or in conformance

with some other criteria.  <u>Id</u>. ¶ 28.  The PAT has the same

physical requirements for both men and women.  <u>Id</u>. ¶ 29.[17]

In 2007, 97.2% of men passed the PAT while 55.1% of women

passed.  Defs.' Response Pl.'s Statement Undisputed Facts ("Defs.

Facts") ¶ 100, ECF No. 87.  In 2008, 96.0% of men passed the PAT

while 65.2% of women passed.  <u>Id.</u>  In 2009, 99% of men passed the

PAT while 84.2% of women passed.  <u>Id.</u>

In two out of these three years, the disparity between male

and female pass rates well exceeds two-to-three standard

deviations, the range the Supreme Court has considered

statistically significant in the context of disparate impact.

<u>Hazelwood Sch. Dist.</u> v. <u>United States</u>, 433 U.S. 299, 308 n.14

(1977); Defs. Facts ¶ 102.  In essence, the United States relies

---

[17] Prior to using the PAT, the Commonwealth used the Cooper
Test as a selection device for hiring COs and CPOs.  Pl. Facts
¶ 15.  The Cooper Test was an age-normed and gender-normed test.
<u>Id</u>. ¶ 17.  Under the Cooper Test, the standards were relaxed for
women.  <u>Id</u> ¶ 21.  For example, the Cooper Test required all
applicants to do a number of sit-ups, push-ups, and complete a
1.5 mile run in a certain amount of time.  Men from the ages of
19 to 29 were originally expected to complete 34 sit-ups, 26
push-ups, and complete a 1.5 mile run in 13 minutes 10 seconds
whereas women of the same age were expected to complete 29 sit-
ups, 21 push-ups, and complete a 1.5 mile run in 15 minutes 49
seconds.  <u>Id</u>.  The Cooper Test was later updated ("The Cooper
II").  The Cooper II required that men of ages 19.5 to 29 be able
to complete 29 sit-ups, 22 push-ups, and run 1.5 miles in 16
minutes 4 seconds, whereas women of the same age were expected to
complete 24 sit-ups, 17 push-ups, and run 1.5 miles in 19 minutes
18 seconds. <u>Id</u>. ¶ 22.

on these raw test scores to argue that the PAT has a negative and disparate impact on women.

The Commonwealth raises numerous arguments. It argues that the PAT is a relatively new test and that, as candidates become more familiar with it, the male-female pass rates even out. Moreover, it argues that even moderate training for the test dramatically increases anyone's chance of passing the PAT. Defs.' Mem. 10. It points to evidence that, when moderately training, 99.6% of men pass while 95.5% of women pass, thus offering a potential cause, or at least a variable, contributing to the disparity. Defs. Facts ¶ 162. The United States counters by noting that test scores recorded **after** this suit had commenced are inherently suspect due to the chance that scorekeepers are aware of the litigation challenge. Hr'g Tr. 16:16-20, Feb. 4, 2011, ECF No. 127. Finally, the Commonwealth argues that, even if the male-female test scores are sufficiently disparate, the United States has not proved that gender was the cause. See EEOC v. Steamship Clerks Union Local 1066, 48 F.3d 594, 601 (1st Cir. 1995); Hr'g Tr. 7:17-10:17.

While it is true that the United States bears the burden of proving the relevant causation, on the facts of record here, such a finding is warranted and the Court draws that reasonable inference here.

## 2. Ruling of Law

The United States has a compelling interest in achieving equal employment opportunity through the removal of unwarranted barriers to employment. See Ricci, 129 S. Ct. at 2697. Indeed, removing unwarranted barriers to employment is "the strongest [reason] for the disparate impact provision because it protects liberty and equality rights. The disparate impact provision removes arbitrary and unnecessary barriers to employment by eliminating business practices that adversely impact [women] without a business justification or where there are equally effective alternatives with less adverse effect. In this way, the provision affords people economic liberty and equality by allowing them to attain their livelihood without unnecessary [gender] barriers." Eang L. Ngov, War and Peace Between Title VII's Disparate Impact Provision and the Equal Protection Clause: Battling for a Compelling Interest, 42 Loy. U. Chi. L.J. 1, 88 (2010). Accordingly, the quantum of evidence necessary to establish disparate impact ought not be too great. Thus the Court finds by a fair preponderance of the evidence that the use of the Caritas PAT **unintentionally** imposes a disparate impact on women and rules that the United States has established the first prong.

**B. The Second Prong – Summary Judgment Ruling**

So too, I thought that the quantum of evidence necessary to establish that the PAT is job related for the position in question and a business necessity ought itself not be too great because the intent of Congress was not to "command[] that the less qualified be preferred over the better qualified simply because of [gender]. Far from disparaging job qualifications as such, Congress has made such qualifications the controlling factor, so that [gender] . . . become[s] irrelevant." <u>Griggs</u> v. <u>Duke Power Co.</u>, 401 U.S. 424, 436 (1971). This same theme is apparent today. The best way not to discriminate is not to discriminate. This is "the important purpose of Title VII – that the workplace be an environment free of discrimination, where [gender] is not a barrier to opportunity." <u>Ricci</u>, 129 S. Ct. at 2674.

**1. The Summary Judgment Legal Framework**

Reciting the teaching of <u>Celotex Corp.</u> v. <u>Cartrett</u>, 477 U.S. 317 (1986), and <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), is today so commonplace as to be hackneyed. Here, it suffices only to say that before summary judgment properly could be rendered against the United States on the second prong, the Court, focusing only on the undisputed facts themselves and drawing all reasonable inferences therefrom in favor of the United States, would have to rule as matter of law that the

17

Commonwealth must prevail.  Moreover, since the Commonwealth

bears the burden of proof on the second prong, the Court must

disregard all evidence in favor of the Commonwealth which, as

fact-finder, it would free to disbelieve.[18]  Reeves v. Sanderson

Plumbing Prods. Inc., 530 U.S. 133, 151 (2000) (noting that the

---

[18] This approach obviously is in tension with the First
Circuit's guidance in Dennis v. Osram Sylvania, Inc., 549 F.3d
859 (1st Cir. 2008), that, "in considering a motion for summary
judgment the [district] court should believe uncontradicted
testimony unless it is inherently implausible." Id. at 856
(quoting dictum in Lauren W. ex rel Jean W. v. DeFlaminis, 480
F.3d 259, 271-72 (3d Cir. 2007)).  Moreover, like the local rules
of many districts, see, e.g., S.D.N.Y. L.R. 56.1; but see Seitz
v. DeQuarto, No. 08-1537, 2011 WL 1377881, *1 n.2 (S.D.N.Y. 2011)
(criticizing that rule), District of Massachusetts Local Rule
56.1 provides that: "Material facts of record set forth in the
statement required to be served by the moving party will be
deemed for purposes of the motion to be admitted by opposing
parties unless controverted by the statement required to be
served by opposing parties."
     Both the guidance of the First Circuit and the command of
the Local Rules appear overbroad in light of Reeves when the
proferred materials come from a party bearing the burden of
proof.  I read Reeves to require that such materials be
disregarded altogether (unless admitted) whether or not the
opposing party actually controverts them due to the fact that the
fact-finder may disbelieve them.  To do otherwise is to conflate
the jury's fact-finding role with the court's law explaining
role, unconstitutionally marginalizing the jury and draining the
court's judgments of their full moral force.  It is this judicial
mindset that evokes much of the most telling criticism of our
processes.  See, e.g., Anderson v. Potter, 723 F. Supp. 2d 368,
372 & n.4 (D. Mass. 2010); Arthur Miller, The Pre-trial Rush to
Judgment: Are the "Litigation Explosion," "Liability Crisis," and
Efficiency Cliches Eroding Our Day in Court and Jury Trial
Commitments?, 78 N.Y.U. L. Rev. 982 (2003); Richard L. Steagall,
The Recent Explosion in Summary Judgments Entered by the Federal
Courts Has Eliminated the Jury from the Judicial Power, 33 S.
Ill. U. L.J. 469 (2009); Suja A. Thomas, The Fallacy of
Dispositive Procedure, 50 B.C. L. Rev. 759 (2009); Suja A.
Thomas, Why Summary Judgment is Unconstitutional, 93 Va. L. Rev.
139 (2007).

court must review the record as a whole, but that "it must disregard all evidence favorable to the moving party that the jury is not required to believe."); <u>see also</u> Robert S. Mantell, <u>Summary Judgment: The Real World</u>, 31st Ann. Lab. & Emp. L. Spring Conf. 275, 276 (Mass. Bar Ass'n, Mar. 11, 2010) ("To rely at summary judgment on evidence that a jury need not believe would be to engage in improper fact-finding.").

### 2. Initial Application of the Legal Framework

Consistent with the directions and strictures limned above, this Court relied only on materials the United States in fact admitted, accepted its proffers of facts at face value,[19] and drew all inferences in its favor. Therefore, the Court completely disregarded the Commonwealth's so-called "validation" studies and likewise disregarded the opinions of its "experts." Indeed, it disregarded **all** the Commonwealth's proffered materials, save for data the United States actually admitted.

---

[19] There is one exception. The "experts" on both sides have ventured their (contrary) opinions on the ultimate legal issues before the Court. While this is appropriate under Fed. R. Evid. 704, it does not prevent adjudication by summary judgment as that rule concerns itself with "genuine issue[s] [of] material **fact.**" Fed. R. Civ. P. 56(c)(2) (emphasis added). The Court has, of course, accepted as true all the subsidiary factual opinions rendered by the United States' "experts."

### a. Relatedness at First Blush

The requirements of job relatedness and business necessity are conjunctive and, on summary judgment both must be established as matter of law.

First, I thought, a little common sense. This is not a case involving treating flight attendants as fashion models, <u>see</u> <u>Gerdom</u> v. <u>Continental Airlines, Inc.</u>, 692 F.2d 602 (9th Cir. 1982), or one where sexist objectification of waitstaff is claimed essential to a business model, <u>see</u> <u>Texas Man Settles Discrimination Lawsuit Against Hooters for Not Hiring Male Waiters</u>, April 21, 2009, http://www.foxnews.com/story/ 0,2933,517334,00.html. These are corrections officers. Daily, many of them must move unarmed (lest their weapons be wrested away from them) through the general populations of the Commonwealth's prisons. It simply stands to reason that their mental acuity, reaction times, speed, agility, and strength have a direct bearing on their fitness to do the job. The Commonwealth has a duty to employ corrections officers physically able to fulfill the requirements of the job. The safety of inmates and staff depends on it. <u>See</u> <u>Dothard</u> v. <u>Rawlinson</u>, 433 U.S. 321, 326-27 (1997); <u>see generally</u> Human Rights Watch, <u>No Escape: Male Rape in U.S. Prison Systems</u>, http://www.hrw.org/ legacy/reports/2001/prison/report.html. This much is common ground between the parties and is truly undisputed. As expounded

upon below, however, common sense in this context simply is insufficient.

The United States points out – and this Court fully accepts for the purposes of summary judgment analysis – that the Caritas PAT was developed using a superficial and professionally unacceptable process; that the Caritas PAT, as an "obstacle course" exercise, does not reflect a representative sampling of the CO and CPO jobs' physical demands; and that the fuzzy "fit" between actual job requirements and the Caritas PAT seriously undermines the ability of that test to identify applicants capable of performing successfully the CO and CPO jobs. <u>See</u> Pl.'s App. 14, Jones Report vi, ECF No. 76-14; Pl.'s App. 15, McArdle Report 4, ECF No. 76-15.

All true, I thought, yet more indicative of the need for a better test (the third prong) than determinative of the second. I thought, when Congress itself uses the term "related" or "relates to", courts are expected to give a generous reading to the concept to implement the congressional intent. <u>See, e.g.</u>, <u>Pilot Life Ins. Co.</u> v. <u>Dedeaux</u>, 481 U.S. 41, 45–46 (1987) (ERISA); and <u>Shaw</u> v. <u>Delta Air Lines, Inc.</u>, 463 U.S. 85, 96–98 (1983) (airline deregulation).

Surely the Caritas PAT is better than no test at all, I thought. Surely the Commonwealth is entitled to seek to upgrade the physical abilities of its correctional officer work force to

respond to potential internal safety threats.  Of course, many corrections officers have desk jobs, work in storerooms, operate transportation, or man gates and checkpoints at the outer perimeter.  But all are expected to be capable of prompt response to unforeseen emergencies.  Many state troopers work desk jobs as well, yet we expect them all to operate the cruisers.  When we arm our law enforcement personnel, we pray they will never have to reach for their guns, but we expect them to shoot straight. We depend on it.

For these reasons, the Court concluded (erroneously as it turns out) that the Caritas PAT, for all its flaws, despite the disparate impact the test apparently had, and even though a better test may be needed, was nevertheless sufficiently "related" to job performance to pass muster.

### b.  Business Necessity at First Blush

Here, the United States admits that workers compensation claims decreased among "new" corrections officers who had taken and passed the Caritas PAT.  The Commonwealth argues that this demonstrates business necessity.  The United States takes strong exception to this claim, providing evidence that such "new" employees are less likely to submit such claims early in their careers and questioning whether the bulk of the claims that were submitted have anything to do with the abilities the Caritas PAT is designed to measure.  <u>See</u> Pl. Facts ¶¶ 233-271.  The Court

gave this evidence full weight and drew all inferences in favor of the United States. What is left is an admitted diminution of claims but minimal evidence suggesting that any more than a few of these claims can be linked in any way to the physical skills tested by the Caritas PAT.

Managing workplace injuries and related costs is an essential aspect of any organizational endeavor, either private or governmental. This is especially crucial for a law enforcement agency such as the Massachusetts Department of Corrections because beneficent Massachusetts statutes may impose extensive long term costs on the Commonwealth should its officers become disabled in the line of duty. See Mass. Gen. Laws Ann. ch. 126 § 18A; see generally, id. ch. 152.

Here, where it remains undisputed that workers compensation claims **did** dip after the adoption of the Caritas PAT, I thought I ought not second guess the responsible state managers by requiring extensive proof of causation. Here, where the complete good faith of Commonwealth officials is unchallenged and where any disparate impact is wholly unintentional, I jumped to the conclusion that the business necessity defense was established as matter of law. Things would be different, I thought, were there a better test with less disparate impact that achieved the same cost savings (the third prong).

### 3. Post Ruling Developments

The Court granted summary judgment on the second prong on January 28, 2011, recognizing that it "should state on the record the reasons for granting . . . the motion." Fed. R. Civ. P. 56(a). That ruling thus became law of the case; it could be revised prior to the entry of judgment only if the Court determined that its reasoning would not "write" or if subsequent proceedings convinced the Court that revision was necessary.

At first blush, subsequent proceedings only tended to confirm the propriety of granting summary judgment. First, objective consideration of the record during the case stated phase convinced the Court that the Commonwealth adopted the Caritas PAT to advance a wholly legitimate public policy goal: the employment of an increasingly physically adept force of corrections officers. Second, as the United States simply gave up on the third prong, I thought myself entitled to infer that it had nothing better to offer than a reversion to the disparate treatment of the Cooper test and simply expected the Court to order the Commonwealth to scurry about under federal supervision with the goal of coming up with something better – at the Commonwealth's expense. On this record, I thought such an order would contravene the congressional intent behind Section 703(k)(1)(A).

## 4. The Irony of It All – And the Need for a Trial

The irony of what the Court had done was not lost on me. After railing on in this and other opinions about how federal judges are too quick to resort to summary judgment, see, e.g., Seitz, 2011 WL 1377881, *1 n.2; In re One Star Class Sloop Sailboat built in 1930 with Hull No. 721, Named "Flash II", 517 F. Supp. 2d at 555-56, and having learned that on one occasion I myself had been too quick to do exactly that, Sensing v. Outback Steakhouse of Fla., LLC, 575 F.3d 145 (1st Cir. 2009), rev'g Sensing v. Outback Steakhouse of Fla., Inc., 566 F. Supp. 2d 24 (D. Mass. 2008), here I was granting partial summary judgment **against** the moving party on a point where the opposing party had not even asked for it. Why? I knew I was laying myself open to charges that I had conflated fact-finding with law explanation (cognitive illiberalism it is being called today)[20] and have used

---

[20] Cognitive illiberalism is demonstrated in cases where the court, by insisting that a case be decided summarily, denies those citizens who see the facts differently an opportunity, in jury deliberations, to "inform and possibly change the view of citizens endowed with a different perspective." Dan M. Kahan et al., Whose Eyes Are You Going to Believe?  Scott v. Harris and the Perils of Cognitive Illiberalism, 122 Harv. L. Rev. 837, 841-42 (2009).  It also makes the decision illegitimate in the eyes of any subcommunities whose members see the facts in a different way.  See id. at 842; see also Stephen B. Burbank, Pleading and the Dilemmas of Modern American Procedure, 93 Judicature 109, 117-18 (2009) (applying cognitive illiberalism analysis to pleading under Twombly and Iqbal).
Stephen B. Burbank, Summary Judgment, Pleading, and the Future of

summary judgment for the purposes of docket clearing.[21]  I

recognize that, since December 1, 2010, it is now the command of

Federal Rule of Civil Procedure 56(a) that summary judgment

"shall" be granted where appropriate, see Steven G. Gensler,

Must, Should, Shall, 43 Akron L. Rev. 1139 (2010), but I continue

to adhere to the sound advice of Judge Brock Hornby: "[W]hen in

doubt on facts or their inferences, judges should 'just say no.'"

 D. Brock Hornby, Summary Judgment Without Illusions, 13 Green

Bag 2d 273, 288 (2010).

        Of course, I **did** have doubts.  But then, I always have

doubts.[22]  The question is not whether I have doubts, but whether

I am honestly certain enough to act to alter the legal

relationship of the parties.

---

Transsubstantive Procedure, 43 Akron L. Rev. 1189, 1193 n.24
(2010); see generally Mark R. Brown, Qualified Immunity and
Interlocutory Fact-Finding in the Courts of Appeals, 114 Penn.
St. L. Rev. 1317, 1332 (2010) ("Together Harris and Iqbal
represent a basic distrust of the district courts' collective
abilities to protect governmental defendants.  Both cases point
to more – not less – interlocutory review. . . . [The Supreme
Court's] preference for efficiency and respect for district court
fact-finding appear to be on life support.").

        [21] Here, the charge that I was using partial summary
judgment as a docket clearing device has some bite.  Not docket
clearing itself, of course; rather, partial summary judgment here
played a role in moving the case **toward** a real trial.  See
Addendum, infra.

        [22]"[D]oubt falls upon me – as it must on all. . . .  I can
do only the best I can."  Major General Lucian K. Truscott Jr. to
his wife Sarah on the eve of the invasion of Sicily, as quoted in
Rick Atkinson, The Day of Battle 84 (2007).

The Court's reasoning followed this path: The Court concluded that summary judgment for the Commonwealth on the second prong was both warranted and appropriate. Still, summary judgment against a moving party is risky. The safer, albeit more costly course would have been to defer decision until after trial. That way, the Court could have had the benefit of evidentiary development and its fact-finding would have been more or less unassailable. Thus the Court was faced with a dilemma akin to that facing every judge presented with a meritorious motion for a directed verdict at the close of all the evidence. Ought I grant the motion as the law requires and end the case? Or should I take the time for arguments, charge, and jury deliberations confident that the jury will "save" me and the case need never be tried again? I am likely to follow the second course; though, had the same motion been pressed at the close of the plaintiff's case with a two week defense case in the offing, I would be more likely to grant it.

So it was here. Concluding on the record before the Court on January 28, 2011, that summary judgment was appropriate for the Commonwealth on the second prong, the Court nevertheless would have denied it and, perhaps, tweaked it's conclusions during the course, of say, a two week trial. Faced with a two month trial, however, the Court granted summary judgment on the second prong, confident that it could revisit the issue if

necessary during the nine day trial of the third prong.  If this
be error, I thought, make the most of it.

Most of these ruminations, however, are quite beside the
point.

Why?

Simply because, when subjected to the salutary discipline of
written analysis, I came to the dawning realization that granting
summary judgment to the Commonwealth on prong two on January 28,
2011 was clearly erroneous.  By referring to the familiar
"relatedness" tests explicated by the Supreme Court in the
airline deregulation and ERISA cases, I had set the
Commonwealth's "relatedness" hurdle far too low and by relying on
common sense I had too quickly assumed the use of the PAT was a
"business necessity" for the Commonwealth.

### 5.  Relatedness and Business Necessity Revisited

In disparate impact cases, "relatedness" and "business
necessity" have particular, albeit nebulous, meanings under the
law.  These requirements of the so-called "business necessity
defense" are indeed conjunctive, but also quite interrelated.

### a. Jurisprudence

The Supreme Court has yet to provide a precise definition
for "relatedness" or "business necessity."  Instead, since the
business necessity defense was introduced in <u>Griggs</u> in 1971, the
burdens and standards have undulated and left lower courts with

little guidance.  To understand the current standards, it is helpful to unwind the Supreme Court's labyrinthine business necessity defense jurisprudence.

As originally articulated in Griggs, the employer bears the burden of showing that the challenged practice has a "a manifest relationship to the employment in question," and "bear[s] a demonstrable relationship to successful performance of the jobs for which it [is] used."  401 U.S. at 431-32.  Four years later, the Supreme Court in Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975), held that employers must do more than allege their practices to be "useful" decision-making tools: "[D]iscriminatory tests are impermissible unless shown by professionally acceptable methods, to be 'predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated.'"  Id. at 431 (quoting 29 C.F.R. § 1607.4(c)).  In Dothard v. Rawlinson, 433 U.S. 321 (1977), the Supreme Court analyzed a height and weight requirements for prison guard applicants and reemphasized that a disparate impact defendant must demonstrate something more than a mere rational or common sense relationship between the challenged practice and job performance.  Id. at 331-32.

The Supreme Court appeared to retreat toward a more relaxed standard in New York Transit Auth. v. Beazer, 440 U.S. 568

(1979), and in a plurality opinion in <u>Watson</u> v. <u>Fort Worth Bank &</u>
<u>Trust</u>, 487 U.S. 997 (1988), in which the Court noted that a
selection device could be defended if the business' goals were
significantly served by the device, even if achieving the goals
did not require use of the device.  <u>See</u> <u>Beazer</u>, 440 U.S. at 587
n.31.

In <u>Wards Cove Packing Co., Inc.</u> v. <u>Atonio</u>, 490 U.S. 642
(1989) the Supreme Court maintained the liberalized standard for
the business necessity defense expressed in <u>Beazer</u> and <u>Watson</u>:

> [T]he dispositive issue is whether a challenged practice
> serves, in a significant way, the legitimate employment
> goals of the employer.  The touchstone of this inquiry is
> a reasoned review of the employer's justification for his
> use of the challenged practice. . . . [T]here is no
> requirement that the challenged practice be "essential"
> or "indispensable" to the employer's business for it to
> pass muster.

<u>Id.</u> at 659 (citations omitted).  The <u>Wards Cove</u> court went even
further though, and held that the defendant employer only bore
the burden of production on relatedness and business necessity
while the "burden of persuasion . . . remain[ed] with the
disparate-impact plaintiff."  <u>Id.</u>

In direct response to <u>Wards Cove</u>, Congress enacted the Civil
Rights Act of 1991 (the "Act").  Pub. L. No. 102-166 § 3, 105
Stat. 1071, 1071 (1992).  The Act, codifying <u>Griggs</u> and other
Supreme Court decisions prior to <u>Wards Cove</u>, makes explicit that
it is a burden of persuasion that passes to the defendant, once a
prima facie case of disparate impact has been made.  <u>See</u> Charles

A. Sullivan & Lauren M. Walter, <u>Employment Discrimination Law and Practice</u> 284 (4th ed. 2009). The Act states that the defendant has the burden of demonstrating "that the challenged practice is job related for the position in question and consistent with business necessity." Pub. L. No. 102-166 § 105(a).

In addition to reassigning the burden of persuasion to the defendant, the Act also clarified that the challenged practice must both be job-related <u>and</u> justified by business necessity. The Act did not, however, provide much illumination on the definition of these terms. Instead, Congress expressly limited the sources of legislative history which could be used to interpret the statute: "No statements other than the interpretive memorandum appearing at Vol. 137 Congressional Record S 15,276 (daily ed. Oct. 25, 1991) shall be considered legislative history of, or relied upon in any way as legislative history in construing or applying, any provision of this Act that related to Wards Cove – business necessity/cumulation/alternative business practice." Id. § 105(b). The interpretive memorandum, however, was similarly vague in its construction of the terms. "The terms 'business necessity' and 'job related' are intended to reflect the concepts enunciated by the Supreme Court in <u>Griggs</u> v. <u>Duke Power Co.</u>, and in the other Supreme Court decisions prior to <u>Wards Cove Packing Co.</u> v. <u>Atonio</u>." 137 Cong. Rec. S 15,276 (daily ed. Oct. 25, 1991) (interpretive memorandum). And so, as

a lower court, I find myself circling back to the old, more restrictive approach to business necessity and job relatedness and struggling to apply the appropriate standards.  Mack A. Player, Employment Discrimination Law 368 (1988); see Bradley v. Pizzaco of NE, Inc., 7 F.3d 795, 797-98 (8th Cir. 1993).

It remains clear that the employer must demonstrate, through professionally acceptable methods, that the test is predictive of, or correlated with important job tasks.  To meet this burden the defendant must present statistical proof in the form of validation studies.  The Supreme Court in Albemarle, codified by the Act, explicitly acknowledged that the Equal Employment Opportunities Commission Uniform Guidelines on Employee Selection Procedures ("EEOC Guidelines") – specifically, the standards of test validation – were entitled to great deference in determining whether an employer has demonstrated that its practices are job related.  Albemarle, 422 U.S. at 430-31.

The validity of a test is established by demonstrating that there is a greater probability that high scorers on the test will perform well on the job than will low scorers.  45A Am. Jur. 2d Job Discrimination § 313.  Employers may satisfy their burden of persuasion by producing "data showing that the content of the selection procedure was representative of important aspects of performance on the job for which the candidates [were] to be evaluated" (content validity) or "empirical data demonstrating

that the selection procedure was predictive of or significantly correlated with important elements of job performance" (criterion validity). 29 C.F.R. § 1607.5(B).

### b. Current Standard for Business Necessity Defense

In distillation of the above, this Court is left with the following two-part standard for the business necessity defense: (1) Business necessity: whether the skill sought to be measured by the employment test is consistent with business necessity (essentially, is the skill actually a prerequisite for the job in question?); and (2) Relatedness: whether the test itself is clearly job related by closely approximating on-the-job tasks (essentially, does the test effectively measure those skills identified in step one? Does the test have content validity?).

The first part of the analysis, business necessity, "inquires whether the job criteria arise out of a manifest business need." Graffam v. Scott Paper Co., 870 F. Supp. 389, 400 (D. Me 1994) aff'd by Graffam v. Scott Paper Co., No. 95-1046, 1995 WL 414831 *4 (1st Cir. July 14, 1995) (unpublished decision). To satisfy this step, the employer must identify the skill or ability the test measures and prove that the tested skills were required or important for effective, efficient, and safe performance of the job (likely by performing a job analysis).

The second part of the analysis, relatedness, "inquires whether there is a [statistically proven] correlation between the criteria used and successful job performance." <u>Id.</u> To satisfy this part of the analysis an employer must show correlation between the skills tested and those required for the job in question, thereby demonstrating that the test effectively measures the skills required.

### c.  The Standard Applied

As the Court acknowledged initially, it is difficult indeed for the party bearing the burden of persuasion to succeed on a motion for summary judgment.  Here, upon further reflection, the Court has realized just how difficult it can be.  Ignoring, as the Court must for purposes of its <u>sua</u> <u>sponte</u> action, all of the Commonwealth's proffered evidence, and relying only on what has been admitted or proffered by the United States, the Court cannot say as matter of law that the PAT is job related and consistent with business necessity.[23]

### i.  Business Necessity

First, "[s]trength and agility tests . . . may be used as selection devices only to the extent that a particular level of

_____

[23] The United States apparently initially believed that it was immaterial whether the PAT was job-related or consistent with business necessity because it believed it could nonetheless prevail by succeeding on prong three.  <u>See</u> Pl. Mem. Supp. M. Summ. J. 5-6.  As such, neither party briefed the issues of relatedness or business necessity and the Court must search the current filings for shards of evidence on these issues.

strength or a particular physical skill is [crucial] for the
job." Player, supra, at 380. The employer, therefore, must
first identify the skills which are necessary prerequisites for
job performance. Although it is common sense to state that
candidates for the potentially dangerous job of correctional
officer need be physically fit, "an imprecise need for 'stamina'
or 'strength' will not justify requiring applicants to pass a
battery of general physical tests." Id. In short, common sense
is not enough to satisfy the first analysis, for business
necessity.

    To satisfy its burden, the Commonwealth would need to
perform a job analysis to determine the skills necessary for the
CO and CPO jobs. Indeed, the Commonwealth proffers expert
reports with just this information. See, e.g., Pl.'s App. 13,
Sharf Report, ECF No. 76-13. These expert reports further claim
that the skills tested by the PAT are "consistent with business
necessity" because after they implemented this new screening
tool, the number of work-related injuries decreased. Id. at 3.
So, the logic goes, if applicants passing the PAT screening are
being injured less, the skills tested by the PAT must be skills
necessary for safe performance of the CO and CPO jobs.

    These reports, however, must be disregarded at this stage.
Moreover, the Court must accept as true the United States'
assertion that the skills tested are not necessary to

successfully perform the duties of a correctional officer. The
United States proffers that the reduction in workplace injuries
is unrelated to the use of the PAT as a screening device and,
therefore, that the PAT has not been shown to be "consistent with
business necessity." To support this claim, the United States
provides expert reports which call into question the validity of
studies demonstrating the reduction in injuries, claiming that
the studies ignore the downward trend in injury rates already
occurring before the PAT was introduced and the improvements in
training and other administrative programs implemented in the
correctional facilities meant to improve safety. Jones Report
vi. As the moving party, the Commonwealth cannot meet its burden
of proving that the PAT is "consistent with business necessity"
because it cannot demonstrate that the skills tested on the PAT
were necessary for effective, efficient, or safe job performance.

### ii. Relatedness

Failing on the first step of the business necessity defense,
it is unnecessary to reach the question of whether the PAT is
"job-related." Even assuming, however, that the Commonwealth was
able to demonstrate that the myriad physical skills tested by the
PAT were indeed prerequisites for the position of correctional
officer, it would still need to demonstrate that the PAT utilizes
appropriate metrics to measure those skills. See United States
v. City of Erie, 411 F. Supp. 2d 524, 556 (W.D. Penn. 2005); see

also <u>Berkman</u> v. <u>City of N.Y.</u>, 536 F. Supp. 177, 208 (E.D.N.Y. 1982) (noting that test makers must "exercise reasonable competence, so that it can reasonably be said that the matters measured by the test are the matters identified as appropriate for measurement by the job analysis").

Hypothetically on these facts, if "trunk strength" were proven, in step one, to be a necessary skill for the position of correctional officer, the second step would inquire whether the requirement that the candidate lift 110 pounds from the floor to their waist five times in under thirty seconds filters those candidates who will safely and effectively perform the job from those who will not. <u>See</u> Pl. App. 34, Rationale for PAT, ECF No. 77-16.

To meet its burden, the Commonwealth would have to demonstrate, through professionally acceptable methods, that the PAT effectively measures those skills required for the position of correctional officer. To do so, it must present validation studies, in compliance with the EEOC guidelines. At this juncture, however, the Court must ignore the validation studies and expert opinions proffered by the Commonwealth.

The United States argues that the test items do not accurately reflect the true physical nature and requirements of the jobs of COs and CPOs. According to the United States' expert reports, the "obstacle course" event of the PAT (consisting of 8

out of the 11 tasks) does not closely track (content validity) or predict the ability to meet (criterion validity) the physical demands of a correctional officer.  Jones Report vi.  Although the individual tasks may appear reasonably to approximate the tasks of a CO or CPO, the series of eight tasks does not reflect a representative sampling of job tasks because it is highly unlikely that a CO or CPO would be required to respond to such a contrived continuous emergency event.  Id.

Moreover, the United States argues that the test lacks criterion validity because it does not distinguish among candidates.  Of the eleven PAT components, four components account for nearly all failures.  Id.  These four components are also the same components which have the greatest disparate impact on women.  Id.  Even if each skill tested on the PAT were deemed to be necessary for job performance in step one, the United States argues that the PAT does not accurately measure seven of the eleven skills and cannot be viewed as "job-related."

Lastly, the United States argues that the test is fundamentally flawed because it was developed using a superficial and professionally unacceptable method.  McArdle Report 4.

Taking all evidence in the light most favorable to the non-moving party, the United States, the Commonwealth does not meet its burden of showing that the PAT effectively measures the skills required for the positions of CO and CPO.

Upon renewed examination, the Court cannot say that the Commonwealth is entitled to judgment as matter of law on the business necessity defense. In light of this analysis, there was nothing for it but promptly to vacate the erroneous grant of summary judgment on prong two and schedule a renewed pre-trial conference to plan for the trial of that prong. This the Court did on March 31, 2011. Order, March 31, 2011, ECF No. 129.

Without further analysis, the Court concludes that the trial of the second prong ought encompass both the relatedness and business necessity issues. Any further guidance for the trial was worked out cooperatively at the final pre-trial conference.

Since December 1, 2010, Rule 56(a) provides "[t]he court should state on the record the reasons for granting or denying the motion." The Advisory Committee Notes explain, "it is particularly important to state the reasons for granting summary judgment. The form and detail of the statement of reasons are left to the court's discretion. The statement on denying summary judgment need not address every available reason."

I rarely take the time, as I have here, to explain a denial of summary judgment since the case is moving toward trial. After all, as my colleague Judge Joseph L. Tauro famously remarked, "What part of the word DENIED don't you understand?" As a matter of essential fairness, however, like most judges when allowing

summary judgment, I have tried to provide an oral or written explanation.

Even with the recent amendment to Rule 56, I shall continue to follow my regular practice of but rarely explaining a denial of summary judgment. Summary judgment practice is already markedly overused, unwieldy, and a source of unwarranted delay. See n.10 supra. To extend a requirement that there be a written judicial opinion on every summary judgment denial is simply unworkable.[24] In fairness, the 2010 revision to Rule 56 does not go this far. It is only hortatory, expressing a view as to what "should" happen. Fed. R. Civ. R. 56(a). My fear is that the rules change will cause even further delay in a federal system that is already sclerotic. I respectfully decline, opting instead to follow Judge Hornby's prescription, "just say no." Hornby, supra, at 288.

### C.    The Third Prong - Trial?

A United States district judge has the responsibility of providing the best justice possible – in every single case.

---

[24] But see generally, Jesse Leigh Jenike-Godshalk, Comment, Appealed Denials and Denied Appeals: Finding a Middle Ground in the Appellate Review of Denials of Summary Judgment Following a Full Trial on the Merits, 78 U. Cin. L. Rev. 1595 (2010) (encouraging district court judges to list the legal and factual reasons for denying a motion for summary judgment to allow for a more informed appeals process).

> *A trial judge bears the unique obligation of providing the fairest possible trial, hearing, and decision.* Appellate courts set minimum requirements. This is where we start. It is our challenge to go much further and conduct the fairest proceedings humanly possible.

Young, Vanishing Trials, supra, at 93.

Here, the best possible justice would involve a trial on the third prong. It is during trial of the third prong that the real heavy lifting would take place and the important Congressional purpose best could be achieved. The real question is not whether the Caritas PAT results in a disparate impact on women (it does), nor is it whether the test is job related and implemented to achieve public policy goals (we'll see). The real question is whether we can do better. Can we achieve those same public policy goals and reduce or eliminate the disparate impact on women? Trial of the third prong would have explored those important issues in a fair and nuanced manner with the goal of truly achieving equal economic opportunity for both men and women while, at the same time, achieving the Commonwealth's significant public policy goals.

Instead, the United States has reneged on its promise of evidence as to the third prong, thrown that issue away in an apparent fit of pique, and appeared ready to take its ball and go to play on another field, evidently hoping against hope that the First Circuit would indulge its on-again off-again penchant for reassigning district court judges in on-going litigation. See

Danaipour v. McLarey, No. 01-11528-DPW, slip op. at 5-9 (D. Mass. Sept. 12, 2003) (Woodlock, J.) (collecting cases); see also United States v. Gonczy, 357 F.3d 50 (1st Cir. 2004), Mandate [01-cr-10055, Doc. No. 395] ("Re-sentencing must be held before a new trier.").

And so there will be no trial on the third prong. What will happen now? At a renewed pre-trial conference held promptly after the Court had vacated its grant of summary judgment on the second prong, the parties agreed to a three week trial of that issue. See note 14, supra. During the three week trial of the second prong, the Court will carefully grope for a test that **is** minimally legally adequate without ever asking the question "Can we do better?" – the question the United States had promised to answer. Resort to this litigation tactic in a lawsuit between the federal government and a state is sad. One hundred fifty years ago, our president had occasion to speak to the states. "We are not enemies, but friends," he said. Abraham Lincoln, First Inaugural Address, March 4, 1861, available at http://www.loc.gov/exhibits/treasures/images/vc2.6p7.jpg. The United States ought heed his words today.

**VI. CONCLUSION**

The United States having prevailed on the first prong via a case stated and abandoned the third prong, the case shall stand for trial on the second prong.

SO ORDERED.


/s/ William G. Young
_____
William G. Young
District Judge

**ADDENDUM**

This case is an example of managing for trial.  Throughout this opinion, I have detailed the management decisions made by the Court to manage for trial.  By "managing for trial," I mean only that I conceive of trial as the primary means provided by our constitution and laws for the fair and impartial resolution of legal disputes and that all litigants come to court seeking a prompt trial or the credible threat of a trial.  <u>See</u> D. Brock Hornby, <u>The Business of the U.S. District Courts</u>, 10 Green Bag 2d 453, 461-62 (2007).  This is called the trial model of district court business.

This is, however, the minority view.  Today, it is the administrative model of the business of the district courts that holds sway.  <u>See</u> Patrick E. Higginbotham, <u>The Present Plight of the United States District Courts</u>, 60 Duke L.J. 745, 747 (2010).  The administrative model seeks the speedy, inexpensive (to the courts), and cost-efficient resolution of every case.  Trials, being costly and inefficient, are disfavored.  <u>See generally</u> Judith Resnik, <u>Trial as Error, Jurisdiction as Injury: Transforming the Meaning of Article III</u>, 113 Harv. L. Rev. 924 (2000).

Both models require hands-on judicial management, of course, but their goals are significantly different. Under the trial model, the judge makes management decisions with an eye toward

how the case is going to be tried.  Settlement and mediation are constantly encouraged but the judicial function is seen as steering the case toward a prompt and fair trial.  The choice to opt-out is left to the litigants.  Under the administrative model, the primary goal is case resolution.  Trial is an option, but usually a last resort.

These are not theoretical differences in management style. They are actual, palpably different approaches that lead to different institutional competencies and outcomes.  The issue is **not** judicial management.  Everyone agrees judicial management is necessary and beneficial.  The issue, rather, is – as one astute commentator has so ably observed – how should district court judges be spending their time?  Steven S. Gensler, <u>Judicial Case Management: Caught in the Crossfire</u>, 60 Duke L.J. 669, 689-697 (2010).

Today, the measures used by the Judicial Conference of the United States publicly to evaluate the performance of the 94 district courts all emphasize the administrative model.  By omission (and in the case of one district, by direct action, <u>see</u> Judicial Conference of the United States, Preliminary Report: Judicial Conference Actions 4, March 15, 2011, (recommending that the President and the Senate not fill the next judgeship vacancy in the District of Massachusetts "based on the three-year low weighted caseload in that district"), these measures tend to

undermine the operations of those courts that are actually the most productive of America's district courts.

It is appropriate, therefore, briefly to analyze how district judges are actually spending their time today and what the supremacy of the administrative model has wrought.

In short, how are we doing?

The answer: not very well at all.

Unfortunately, the administrative model of the district judge now in vogue places little or no value on the trial itself. Yet this aspect of our work – the trial itself (especially the American jury trial) – is the central and unique societal benefit that the district court judiciary contributes to our nation. Consider the views of three of the most knowledgeable judicial observers of our work:

The brilliant Judge Richard S. Arnold cuts directly to the bone:

> I think in the 20 years since I was a district court judge, we've seen a tremendous increase in volume, tremendous pressure to decide cases without thinking very much about them, tremendous pressures to avoid deciding cases. I mean, some judges will do almost anything to avoid deciding a case on the merits and find some procedural reason to get rid of it, coerce the parties into settling or whatever it might be.

Judge Richard Arnold, Mr. Justice Brennan and the Little Case, 32 Loy. L.A. L. Rev. 663, 670 (1999).

> How might reality television portray a federal "trial" judge in civil lawsuit garb? In an office setting without the robe, using a computer and court

administrative staff to monitor the entire caseload and
individual case progress; conferring with lawyers (often
by telephone or videoconference) in individual cases to
set dates or limits; in that same office at a computer,
poring over a particular lawsuit's "facts," submitted
electronically as affidavits, documents, depositions, and
interrogatory answers; structuring and organizing those
facts, rejecting some or many of them; finally,
researching the law (at the computer, not a library) and
writing (at the computer) explanations of the law for
parties and lawyers in light of the sorted facts.[25]   For

---

[25] "Fact sorting" is a new concept.  As Judge Hornby
explains it, most fact sorting occurs in the summary judgment
context.  "Typically, [lawyers] present . . . information
electronically, through the courts' electronic case filing
system.  The district judge or magistrate judge sorts these
electronically-provided facts and determines which are undisputed
and which facts matter, thus discarding other facts. . . ."
Hornby, <u>supra</u>, at 460.

Whatever happened to fact-**finding**?

[F]act-finding is difficult.  Exacting and time consuming
it inevitably falls short of absolute certainty.  More
than any society in history, the United States entrusts
fact-finding to the collective wisdom of the community.
Our insistence on procedural safeguards, application of
evidence rules, and our willingness to innovate are all
designed to enhance impartial fact-finding.

Judicial fact-finding is equally rigorous.  Necessarily
detailed, judicial fact-finding must draw logical
inferences from the record, and, after lucidly presenting
the subsidiary facts, must apply the legal framework in
a transparent written or oral analysis that leads to a
relevant conclusion.  Such fact-finding is among the most
difficult of judicial tasks.  It is tedious and
demanding, requiring the entirety of the judge's
attention, all her powers of observation, organization,
and recall, and every ounce of analytic common sense he
possesses.  Moreover, fact-finding is the one judicial
duty that may never be delegated to law clerks or court
staff.  Indeed, unlike legal analysis, many judges will
not even discuss fact-finding with staff, lest the
resulting conclusions morph into judgment by committee
rather than the personal judgment of the duly constituted

federal civil cases, the black-robed figure on the bench,
presiding publicly over trials and instructing juries,
has become an endangered species, replaced by a person in
business attire at an office desk surrounded by
electronic assistants.
. . . .

---

judicial officer.

Fair and impartial fact-finding is supremely important to
the judiciary.
. . . .
While trial court legal analysis is appropriately
constrained by statutes and the doctrine of stare
decisis, the true glory of our trial courts, state and
federal, is their commitment to fair and neutral fact-
finding. Properly done, facts found through jury
investigation or judicial analysis truly are "like
flint."

Yet there has been virtual abandonment by the federal
judiciary of any sense that its fact-finding processes
are exceptional, or due any special deference. Federal
district court judges used to spend their time on the
bench learning from lawyers in an adversarial atmosphere,
and overseeing fact-finding by juries or engaging in it
themselves. This was their job and they were proud of
it. Today, judges learn more reflectively, reading and
conferring with law clerks in chambers. Their primary
challenge is the proper application of the law to the
facts – facts that are either taken for granted, or
sifted out of briefs and affidavits, and, in the mode of
the European civil justice systems, scrutinized by judges
and clerks behind closed doors. While judges do talk to
lawyers in formal hearings, these hearings can be short,
and usually serve to test and confirm a judge's
understanding rather than develop it.

William G. Young, <u>A Lament For What Was Once and Yet Can Be</u>, 32
B.C. Int. & Comp. L. Rev. 305, 312-314 (2009) (footnotes omitted).
Truly, the eclipse of fact-finding foreshadows the twilight of
judicial independence. <u>See</u> <u>Seitz</u>, 2011 WL 1377881 *1 n.2.
    The affidavit is the Potemkin Village of today's litigation
landscape. Purported adjudication by affidavit is like walking
down a street between two movie sets, all lawyer-painted façade
and no interior architecture.

> Trials have gone the way of landline telephones – useful
> backups, not the instruments primarily relied upon.
> . . . .
> Trials as we have known them . . . are not coming back.

Hornby, supra, at 462, 467-68 (footnotes omitted); see generally,
Arnaud Lucien, Staging and the Imaginary Institution of the
Judge, 23 Int'l J. for the Semiotics of L. 185 (2010).

> The faces of the United States district courts are
> fading. . . . Grants of summary judgment without any
> live appearance by counsel [are] commonplace, depriving
> trial attorneys of the opportunity to bring papers to
> life with oral argument.  Instead, the papers [are]
> filed, and, some time later, a written order [is] issued.
> This is no lonely pixel.  The phenomenon is fueled by the
> centrality of the motion for summary judgment, which has
> displaced the trial as the destination point for
> litigation.  Today it is unlikely that a trial date will
> ever be set, and rarer still that a trial date will have
> any meaning to the court and hence to the parties. . . .
> On average, a U.S. district judge tries fourteen cases,
> civil and criminal, per year, which last an average of
> between four and five days.  Therefore, the average
> district judge has nearly three hundred days each year
> with no trials.  I highlight these figures not to suggest
> that these judges are not working but rather to inquire
> as to what type of work they are doing.
> . . . .
> In reality, trials are an increasingly small part of the
> daily routine of the federal trial courts. Most district
> courts now try very few civil or criminal cases – a
> documented phenomenon I will not rehearse here.  One must
> keep this picture ever in mind because it is the most
> salient feature of the federal trial courts today – and
> as I see it, the manifestation of the illness I will
> discuss.
> . . . .
> I will argue that federal trial courts are now more like
> administrative agencies than trial courts in their
> present efforts to discharge their duty to decide cases
> or controversies, and that we are witnessing the death of
> an institution whose structure is as old as the Republic.
> . . . .

The proposition that trial courts should try cases seems a given, yet the reality is that federal district courts have moved so far from this task that it is an open question.  At the outset I observed that many judges do not agree that conducting trials ought to be their primary function.   Judges who subscribe to this philosophy hold trials only when they cannot persuade the parties to settle their case through mediation or through protracted delays before scheduling a trial.   Such attempts at stalling as a means to provoke settlement provide one compelling explanation for the increase in time to trial even as trials have decreased in number. But a return to a model in which the principal work of the trial judge is to try civil and criminal cases need not take away from opportunities for litigants to privately elect methods to settle their disputes. Historically, setting a firm trial date and providing pretrial access to the presiding judge has produced a 90 percent settlement rate with a shorter time from trial to disposition.

. . . .

## Conclusion

The present state of affairs makes plain that the federal district courts are not on the correct path.  Returning to a trial model would be a significant step toward fulfilling the traditional expectations for the federal courts.   Much of the present difficulty arose from seductive – but ultimately misguided – notions that there is a better way.

The United States district courts are the most vital judicial institution in this country.  Their courageous history of protecting the constitutional rights of the disfavored and the downtrodden has earned their great prestige and solidified their venerable role in American governance.  Federal trial courts cannot maintain this status if they become indistinguishable from state highway departments; but on the present trajectory, this is their destination.  If this bleak picture comes to pass, life tenure cannot be defended, and Article III "trial" courts will become indistinguishable from the thousands of administrative law judges.  Civil service is just over the horizon.

Patrick E. Higginbotham, <u>The Present Plight of the United States District Courts</u>, 60 Duke L. J. 745, 745-747, 761-762 (2010)

(footnotes omitted).  Actually, Judge Higginbotham is being generous in estimating 14 trials per year per active district judge.  The most recent available figures reveal that the average active district judge tried 4.4 civil and 5 criminal cases to verdict in the 12 months preceding September 30, 2010.  Data derived from Table C-12, "U.S. District Courts Trials and Trial Days Period Ended Sept. 30, 2010" and Table T-2, "U.S. District Courts Length of Civil and Criminal Trials Resulting in a Verdict or Judgment by District, for the 12 Month Period Ended Sept. 30, 2010 Civil Trials of Miscellaneous Cases."

Today the mantra is judicial management: management and more management.  This is the distillate from the recent important conference on the Federal Rules of Civil Procedure held at Duke Law School. See Gensler, supra.

> As I noted some years ago:

> Of course, most cases ought settle.  Of course, we must embrace all forms of voluntary ADR.  Of course, we must be skilled managers.  But to what end?  To the end that we devote the bulk of our time to those core elements of the work of the Article III trial judiciary – trying cases and writing opinions.  We ought to remember, as the RAND study and all of its progeny confirm, the best case management tool ever devised is an early, firm trial date.

> The truth of the matter is that good management and traditional adjudication go hand in hand.  We ought to confirm that basic truth, study how it is done, trumpet it, budget for it, and fight for it.  The district court judiciary ought to be the nation's most vigorous advocates of our adversary system and the American jury. We fail at our own peril.

William G. Young, <u>An Open Letter to U.S. District Judges</u>, The
Federal Lawyer, July 2003 at 30, 33.

As an institution, however, the federal judiciary no longer
seems to place much value on trial productivity at all.  <u>See</u>
Leonard Post, <u>Federal Tort Trials Continue a Downward Spiral</u>,
Nat'l L.J., Aug. 22, 2005, at 7 (quoting Professor Stephen
Burbank as saying "federal judges now give more attention to case
management and non-trial adjudication than they give to trials,"
and "it is quite clear that 'trial' judges ought to spend more
time on that activity from which the[ir] name is taken.")  Jurors
- our constitutional partners in all that is decreed – rate but
two passing mentions in the new Strategic Plan for the Federal
Judiciary.  Judicial Conference of the United States, Strategic
Plan for the Federal Judiciary September 14, 2010, <u>available at</u>
www.uscourts.gov/uscourts/FederalCourts/Publications/StrategicPla
n2010/pdf.  Trials are never mentioned.  We assiduously measure
district court efficiency and yearly rank all 94 district courts
against these measures.  <u>See</u> Administrative Office of the U.S.
Courts, 2010 Federal Court Management Statistics, <u>available at</u>
http://www.uscourts.gov/fcmstat/index.html.

Yet nowhere do we publicly measure **actual** productivity – the
core work of the federal district judge, going out on the bench
and actually trying our cases and engaging with litigants and the
bar in the actual adjudicative process.  As Judge Higginbotham

noted years ago, the "Trials Completed" section of our Case Management Statistics is misleading and borders on the disingenuous.  Patrick E. Higginbotham, <u>So Why Do We Call Them Trial Courts?</u>, 55 S.M.U. L. Rev. 1405, 1405-06 (2002).  I make the same criticism in <u>A Lament For What Was Once and Yet Can Be</u>, <u>supra</u>.

We keep productivity data of course.  We just choose not to share it publicly.  As noted above, during the 12 months preceding September 30, 2010, the average active district court judge tried 4.4 civil cases and 5 criminal cases.  During those same 12 months, that judge presided over evidentiary hearings for an average of 192 hours and was out on the bench in total an average of 372 hours.

> The results of our own indifference toward jury trials are already sadly apparent.  Because we no longer seem very interested in using our courtrooms, we are losing them.  Further, the institutional judiciary seems bent on dismantling the superb professional teams so essential to sustained trial operations.  Somehow, we seem to be forgetting that the very reason for our judicial existence is to afford jury trials to our people pursuant to the United States Constitution.  Ironically, our ability to control our dockets to avoid the quotidian details of daily jury trials and save ourselves instead for "really big" constitutional adjudication insures that such cases will come our way less frequently.
> . . . .
> Having set [our]selves adrift from [our] constitutional partner – the American jury – federal trial judges now find themselves bereft of the central wellspring of [our] moral authority.  Public disparagement and Congressional disdain follow in the wake of this trend.

William G. Young, <u>Vanishing Trials, Vanishing Juries, Vanishing Constitution</u>, 40 Suffolk U. L. Rev. 67, 80-81 (2006) (footnotes omitted).

Suppose instead we were to rank our district courts on actual productivity data?  At minimum, this would demonstrate that the institutional judiciary cares about such matters.  I predict, moreover, that such a ranking would provide an enormous incentive for invigorating the trial model of adjudication and with it, the constitutional values a truly independent judiciary is designed to protect and advance.  To that end, I set out here a listing of America's Most Productive Federal District Courts as derived from the official records of the Administrative Office of the United States Courts.  These are the courts that occupy the top third (i.e. the top 31 spots out of the 94 district courts) in the composite ranking.  We can all learn from these courts.  These are the courts most deserving of our support – the courts we all ought be imitating. It is my hope that this exposition will promote genuine discussion addressing the fundamental issue – how ought Article III district judges be spending their time?